Filed 4/25/22  P. v. Connell CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEREK CONNELL,<br><br>    Defendant and Appellant. | B317244<br><br>(Kern County Super. Ct. No. BF164057A) |

APPEAL from a judgment of the Superior Court of Kern County, John R. Brownlee, Judge.  Affirmed in part, reversed in part and remanded with directions.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Louis M. Vasquez, Supervising Deputy Attorney General, Lewis A. Marintez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Derek Connell was convicted following a month-long jury trial of the first degree murder of his stepfather, Christopher Higginbotham, and the second degree murder of his mother, Kim Higginbotham. The jury also found true specially alleged firearm-use enhancements as to both offenses and the multiple-murder special circumstance. The trial court sentenced Connell to life without parole plus three consecutive indeterminate state prison terms of 25 years to life.

On appeal Connell contends there was insufficient evidence identifying him as Kim's[1] killer and the prosecutor committed prejudicial misconduct by misstating the law regarding the burden of proof during closing argument. Connell argues in the alternative his sentence for second degree murder must be corrected because life without parole is not an authorized sentence notwithstanding the multiple-murder special-circumstance finding. The People acknowledge the sentence for second degree murder was unauthorized and also contend the sentence for first degree special-circumstance murder was unauthorized and must be corrected. We affirm both convictions, vacate the sentence and remand the cause for resentencing.

---

[1]     Because Christopher Higginbotham and Kim Higginbotham share the same surname, we refer to them by their first names to avoid confusion. Similarly, we refer to Derek Connell's aunt Sonia Connell, a witness in the case, by her first name.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

The information charged Connell with two counts of first degree murder (Pen. Code, § 187, subd. (a))[2] for the deaths of Christopher (count 1) and Kim (count 2). It specially alleged for each count Connell had personally and intentionally discharged a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d)). In addition, the information alleged for each count a multiple-murder special circumstance (§ 190.2, subd. (a)(3)).

2. *The Evidence at Trial*

a. *The 911 call and the homicide scene*

According to the evidence presented at trial, which began in January 2020, on Saturday, April 30, 2016, at 1:23 a.m., the Bakersfield Police Department received a 911 emergency dispatch call—the audio recording of which was played to the jury—from Sonia Connell, Kim's younger sister. Sonia told the 911 operator she was calling from Scotland about "a really strange message" she had received from her 29-year-old nephew. Sonia first received a cryptic text message from Connell, who lived with his mother and stepfather, earlier that morning that said something like, "Mom dead, rice." When Sonia responded with a question mark, Connell sent another text that stated, "Mom's dead." Sonia responded, "[W]hat do you mean, Derek? You're scaring me," and he replied, "Mom and Chris are dead." Sonia sent Connell a text asking him to call her immediately to explain what he meant, but he did not respond. Connell also did not answer Sonia's phone calls or additional text message telling

---

[2] Statutory references are to this code.

3

him she was really upset and again asking him what he meant, so Sonia called her sister's cellphone using a video calling app. Connell's face appeared on the screen. It was around 1:00 a.m. Although looking "spaced," he was very calm.

When Sonia asked Connell what was going on, Connell said, "They're dead." He rotated the phone's camera to show Christopher's and Kim's bodies lying in pools of blood. Christopher, who was motionless and facedown with his arms up, had blood around his head. Connell panned the camera to the hallway, where Kim's motionless body was crouched over. Kim had blue lips. Sonia was not sure whether Christopher and Kim were alive or dead. Connell said that "he came back and he found 'em like that." When Sonia asked Connell what had happened, he responded, "I don't know[;] I was out. And I came back and, ah, two hours ago." Sonia told the 911 operator, "He just said that he was out and he never goes out." When Sonia said to Connell, "Two hours ago, you don't phone the police?" he responded, "No, um, I'm gonna phone the police now." Sonia told Connell she was going to call them. Sonia asked, "[D]id you do it?" and Connell said, "No."

Minutes after Sonia's 911 call, Bakersfield police officers arrived in four or five patrol cars in the vicinity of the Higginbothams' residence. The officers left their cars on another street and approached the residence. The home's patio and interior lights were on, and the sound of objects banging against each other emanated from the house. The porch light then turned off. The garage door, which had been closed, began to roll up; and a luxury-brand SUV started to move backward out of the garage. The officers, with guns drawn, ordered Connell, who was

4

the SUV's driver and sole occupant, to get out of the vehicle, which stopped in the middle of the driveway.

The police searched Connell and the SUV. Connell told one of the officers, "My parents are shot in the house." He responded in the negative when asked by an officer if there was anybody in the home. Connell smelled of alcohol; had red, watery eyes; and was unsteady on his feet as he walked. Connell's pants had wet bleach stains. One of his pant legs also had a red streak running down it, and his right pant pocket had a reddish-brown stain. He had dried blood around the cuticles of his hands, on his ring finger and in the area of his thighs. There were two bottles of bleach and a container of a powdered cleaning agent in the cargo area of the SUV.

Five officers entered the house, which had a strong odor of bleach. Christopher's body was found on the floor between one of the living room sofas and a wall with an entrance to the kitchen. His body had cleaning agents on it and what appeared to be bleach staining. The shirt on Christopher's body had white stains consistent with bleach. There was blood around Christopher's head, which was on a dish towel; and there were marks on his arms. A white cleaning solution and a powdery substance covered the floor. There were footprints and marks in the solution, which had been dispersed throughout the house.

Kim's body, which was about 10 or 20 feet from Christopher's, was lying on the floor in a hallway. Directly behind, and closest to, Kim's body was the west bedroom, where the police found a blue shirt containing reddish-brown stains. Immediately to the east was the middle bedroom (a converted office), and the final bedroom was the master bedroom. The master bedroom contained numerous firearms: a .38-caliber

revolver (specifically, a .38 Special, the murder weapon), along with .38-caliber ammunition, in the nightstand to the left of the bed; a .48-caliber pistol, loaded but with no round chambered, inside a case located in the nightstand to the right of the bed; a shotgun, also loaded but with no round chambered, sitting upright in a corner; and a variety of other firearms (including a shotgun, rifles and pistols) that were not loaded and were either inside cases under the bed or inside the master bedroom closet. No other guns were found in the house.

In the kitchen, on the counter, were four spent shell casings. In addition to a spent bullet near Kim's foot, the police recovered a second expended bullet, which had been located just inside the front entryway of the house. Inside a cabinet in the entryway was an address book with information for Kim and Christopher that contained $649 in cash, including a $5 bill with a reddish-brown stain. DNA analysis of the stain showed it did not contain Connell's or Christopher's DNA, but Kim's DNA could not be excluded. A small amount of cash ($42) was also recovered from inside the toilet of the hallway bathroom, which was visible from the west bedroom.

Aside from law enforcement personnel (and Christopher's and Kim's bodies), no one was found inside the home during the officers' search. There were no signs of a forced entry, no broken glass in the house and no signs of a struggle, such as overturned furniture. A firearms specialist from the Kern Regional Crime Lab with expertise in identifying the weapon used for firing expended bullets recovered from crime scenes determined that the two spent bullets from the Higginbothams' house and two later recovered from Christopher's body were fired from the .38 Special in the left nightstand of the master bedroom.

b.   *The autopsies*

An autopsy conducted by a forensic pathologist with the Kern County Sheriff Coroner Division showed Christopher had three gunshot wounds.  The wound from a bullet recovered from Christopher's spinal canal was lethal, and death likely would have occurred within 10 or 15 minutes.  A second wound[3] from a bullet recovered from Christopher's chest wall, although likely not contributing to Christopher's death because of the rapid hemorrhaging caused by the first bullet, was potentially lethal.  The third wound, a "through-and-through" wound in which the projectile had entered and departed the body, was severe but probably nonlethal unless no medical attention was provided.

None of the three wounds showed any soot, black discoloration or stippling, which looks like pinpoint-red freckles and is caused by the skin's contact with partially burnt hot gunpowder when the tip of a gun's barrel is within 18 inches of the target.  Although a wound where the gun had made contact with the body would also show no soot or stippling, as with wounds caused by a gun fired from a distance (in excess of 18 inches), a contact wound, unlike a distant gunshot wound, would show signs of gunpowder blasted deep into the tissues.  None of Christopher's gunshot wounds showed any signs of gunpowder deep within the tissues.

Among the forensic pathologist's other findings, Christopher's upper chest, left chest, left shoulder, neck and throat had light brown areas of what looked like damage to the

---

[3]   The forensic pathologist could not determine the chronological order in which Christopher had suffered the gunshot wounds and had arbitrarily labeled them as first, second and third.

skin, but the pathologist opined that those areas reflected postmortem or perimortem damage caused by bleach or another chemical, not antemortem injuries indicative of a violent altercation. He determined the cause of Christopher's death to be multiple gunshot wounds and the manner of death to be a medical homicide—that is, death at the hands of another or others.

Kim's autopsy showed one gunshot wound—a lethal, through-and-through wound with no signs of soot or stippling, nor any gunpowder residue within the tissues. Kim's death was determined to be the result of a gunshot wound to the chest by manner of a medical homicide.

### c. *Connell's first interview*

At 6:00 a.m. on April 30, 2016, Bakersfield Police Detectives Kenneth Sporer and Claude Brooks interviewed Connell, a recording of which was played for the jury.[4] Connell appeared drunk and smelled of alcohol at the time. He told the detectives Christopher and Kim had bought the house in Bakersfield in 1995 and had lived there for 20 years. Connell, an only child, grew up in that house and went to high school in Bakersfield, but he joined the Army before he graduated. Connell was deployed to Iraq and Afghanistan and served for three and a half years as an infantryman. He developed medical problems: His body was "breaking down"; his back and knee were giving out; and he had three surgeries on his right knee. He

---

[4] An audio and visual recording of the April 30, 2016 interview was played to the jury until it malfunctioned, and then only the audio recording was played. The prosecutor and Connell's counsel both stipulated Connell's demeanor stayed the same for the remainder of the interview.

8

left his military service early and came back to Bakersfield, but then immediately left for Texas after he met a Canadian in the airport who worked on an oil rig and offered him a job. He worked in Texas for "[q]uite awhile," although he had also been transferred to different places and worked in Colorado, and had a Texas cellphone number for 10 years. In February or March of 2016 he was laid off from his job as a Texas oil field driller; and he moved back to the Bakersfield house, where he lived with Kim and Christopher, with whom he "g[o]t along great."

Asked by Detective Sporer to explain what he did that day,[5] Connell responded that, after he woke up, he and Christopher had gone shooting at 8:30 a.m. in Tehachapi. He and Christopher were there for two hours and shot all of Christopher's many guns, "everything [Christopher] has." Connell, who was born in Scotland, had an immigration appointment at 2:45 p.m. in Fresno to get a stamp for his passport. After returning to Bakersfield from Tehachapi he borrowed Christopher's truck and left for Fresno at 11:45 a.m., arriving early at 2:00 p.m. At 3:30 p.m., after his appointment, he ate at a casual dining restaurant/sports bar in Fresno and left at 4:30 p.m. He began driving back to Bakersfield when he got a call from a childhood friend, Tyler Teeague, who was flying to Las Vegas from Denver and wanted to meet, so he headed toward Las Vegas instead.

---

[5] Although Detective Sporer, within several hours of Sonia's 1:23 a.m. 911 call on Saturday, had asked Connell to explain what he did "today," it is clear Detective Sporer's inquiry and Connell's response related to events beginning on Friday, April 29, 2016, through early in the morning on Saturday, April 30, 2016.

9

Connell spoke to Kim on the phone and told her he was going to Las Vegas. She later sent him a text message, which said he should treat himself to something as it was a Friday. He tried to call her again three times to tell her he would be staying at the New York-New York Hotel and also tried calling Christopher three or four times. Receiving no answer from them, Connell decided to turn around and return to Bakersfield. At that point he was two hours from Las Vegas.

Connell arrived in Bakersfield at 11:00 p.m. or 11:45 p.m. and went straight to the house. The first thing he saw as he walked into the house from the garage was Christopher lying in a pool of blood in the living room. Connell thought Christopher might have still been breathing because it looked as if Christopher's chest moved up and down at least once, so he shook Christopher to see if Christopher was still alive. Connell said something. Christopher did not respond, but Connell did hear a gurgling noise and told the detectives "if that means he's alive, then he was alive." Connell walked further into the house, looked down the hallway and could see Kim on the floor. He went to Kim, who was lying on her side in front of the hallway bathroom door and facing the bathroom. Connell lay on the floor perpendicular to her, with his body in the bathroom and extending into the hallway and his face next to her face. Her lips were blue, and she was cold to the touch. He went back to Christopher and spent 30 or 40 minutes trying to "clean up some of the mess" around the body using a mop, as well as bleach and a powdered cleaning agent that he had found under a sink, but "it didn't do anything." He also poured the substances on Christopher's body, first telling the detectives he had thought Christopher was alive at the time and then later claiming

otherwise. After using all of the bleach and the other cleaning agent, he put the empty containers in the back of the SUV to be recycled. He had been wearing a blue shirt that day when he came home, but he took it off and put it on his bed. He also changed shoes after his attempt at cleaning up.

Connell later got in the SUV and immediately texted his aunt and told her his mother and Christopher were dead. Connell drove around in circles, going as far as Stockdale Highway and the Grapevine, and never got out of the car. When he returned home and walked in the house, his aunt called back, and he showed her the bodies and asked her what to do. He was frightened he would "get in trouble for it" because he had been the only person in the house. After his aunt told him to call the police, he was "gettin' ready to and then they—they were there."

Connell had previously been arrested for public intoxication more than 10 times in Texas and California and had a history of DUIs. Kim did not like him being drunk, and they had in the past argued about his drinking and driving. Without being asked, Connell told the detectives he did not get violent when he drank alcohol. Connell at first claimed his total alcohol consumption that day was two or three beers at the Fresno sports bar and he did not do any drugs. When Detective Sporer reminded Connell of his statement that he had left the sports bar at 4:30 p.m. and said he still smelled of alcohol 14 hours later, which would not have been possible even if he had four beers, Connell said he also had a couple of shots of whiskey there and nothing more. When the detective explained the police had taken a sample of his blood for testing and the result would "come back with a zero" if he had consumed all the drinks 14 hours previously, Connell then said he had stopped at a bar on his way

11

to Las Vegas and had three additional shots of straight whiskey. After seeing Kim's and Christopher's bodies he drank four beers from the garage's mini-refrigerator.

Asked what he thought might have happened, Connell said Christopher had gambling debts with a loan shark and had in the past gotten into trouble with gambling. Christopher gambled on everything, including horse racing and boxing, and had debts of "[u]pwards of 50 to 100 grand." Christopher would get a call from his bookie, Nacho, and then disappear with a bag. Christopher kept his money in a locked safe in his closet, which stored both a tall rifle safe and a little safe. Connell could gauge how much money a stack of cash contained by its size.

There was $20,000 in cash in the house, including some in a brown box in the attic crawlspace, the access to which was located directly above Kim's body in the hallway. Connell did not have a bank account and kept his cash in a book in an armoire in the entry, as well as in the attic. Connell then said the cash in the book in the entryway's armoire was not his money; it belonged to the entire family, and he was required to ask permission before he could take any of it. With Christopher's authorization, he had taken $200 in cash from the book that day at around 11:30 a.m., when he left for Fresno. That cash, along with a credit card, was what he had later intended to use to pay for his Las Vegas trip. He subsequently put back in the book the cash he had taken.

During Connell's military service, a lot of the soldiers in his platoon, including Connell, had been taking steroids and oxycodone pills, and his entire platoon had gotten into trouble often for raiding a pharmacy in Iraq multiple times. Connell had also drunk a lot of whiskey even though doing so in a combat

zone was prohibited. Detective Sporer asked, "[I]f we're in the Army and we're in a—a country where we are having some war-time action . . . we can break into businesses and places, steal from those places repeatedly, and that's not a dishonorable discharge?" Many in Connell's platoon had been "kicked out of the Army." Connell, although not receiving a dishonorable discharge, had not been honorably discharged.[6]

Detective Sporer asked Connell to describe once more the timeline of the day's events. Connell again explained where he had been and at what time throughout that day and added that Teeague had called him around 7:00 p.m., Connell had been close to Barstow between 9:00 p.m. and 10:00 p.m. when he decided to turn around, and he had been calling Kim and Christopher several times on the way home. Detective Brooks told Connell that when a call is made from a cellphone, "[i]t . . . pings off of each cell tower that shows your location," so the detectives would be able to "see exactly where you were through your cellphone . . . throughout the day" once they obtained Connell's cellphone records from his service provider. He asked Connell if the records would show Connell, Kim and Christopher were all in the same GPS location when Connell made the phone calls to his parents. Connell at first replied, "No—why would I call them if I'm on the same GPS location? . . . I wouldn't call them if I was in the . . . same house." When Detective Sporer asked whether the cellphone records would show that Connell had called Kim and Christopher after the time Connell claimed to have found their bodies, Connell replied in the affirmative, explaining while he

---

[6]    At trial, Connell testified he had received an "other than honorable discharge" because "we did some things over there that were . . . less than honorable to our country."

13

was at the house, after he had already found the bodies, he had called to try to locate Christopher's cellphone. He claimed he had "honestly" misunderstood Detective Brooks's earlier questions on the subject.

### d. *Connell's second interview*

On May 2, 2016, two days after the first interview, Detective Sporer again interviewed Connell.[7] Connell told the detective he believed he had lied during his prior interview because "when I'm intoxicated . . . I couldn't tell the truth even [if] you paid me to do it."[8] He said he had since had time to "sleep on it," was sober and no longer had that problem. Connell told Detective Sporer he had not gone to Tehachapi on Friday morning and "honestly" had "no clue" why he had said that. The only occasion he had to leave the house that Friday morning was to depart, at 11:30 a.m., for his 2:45 p.m. appointment with the immigration office. He could not go to the one located in Bakersfield because that office did not issue a permission-to-work stamp. He had most recently gone shooting with Christopher on

---

[7] The audio recording of the May 2, 2016 interview was played for the jury; but, because background noise marred the recording's conclusion, the parties stipulated to the accuracy of, and admission in evidence for the jury's consideration, a transcript of the recording.

[8] When asked at trial to rate, based on the detective's training and experience, how intoxicated Connell had appeared to be during the April 30, 2016 interview, Detective Sporer testified that, although Connell had smelled of alcohol, he had appeared to be "much close[r] to the barely-feeling-the-effects" end of the spectrum and not on the other, "falling down drunk" end.

14

Friday of the previous week at a shooting range in Bakersfield, and that was the last time he had shot the .38-caliber gun.

After his immigration appointment Connell went to the sports bar in Fresno; headed toward home at 4:30 p.m.; stopped at 6:15 p.m. at a bar and drank two or three beers; and then went to another bar and drank three more beers. He had not driven toward Las Vegas and had not received any calls from Teeague. That part of his story had been a lie.

Connell finally arrived home sometime between 7:30 p.m. and 7:45 p.m. Connell had a clear recollection of eating some salad and then sitting on the couch and talking with Christopher, who asked if "everything went well with the green card." They had not argued. Connell had not initially seen Kim but thought she was working in the spare bedroom. After his discussion with Christopher, Connell walked to his room and lay on his bed. He "remember[ed] that perfectly." Asked to explain the next thing he remembered after coming out of his room, Connell, stating he did not remember leaving his room, replied that he recalled sitting in the back of a police car and going to a hospital to have his blood drawn.

Sometime after Connell had lain on his bed something had happened. Asked by Detective Sporer if anybody had broken into the house, Connell said, "No." Only Christopher, Kim and he had been in the house. Connell believed "it was something that had to do with [Connell's] drinking." Detective Sporer stated, "Okay. So you believe that you did something?" Connell replied, "I do. I do believe I did something." Asked what he believed he had done, Connell responded, "I believe I—I killed my parents." He said he "honestly" did not remember how he did it. He thought Christopher had been shot in part because he had seen people

shot before, but claimed he did not remember where he put the gun.  He also claimed he did not enter his parents' bedroom for any reason.

Connell admitted having had arguments with his parents in the past.  Usually if he and Kim had been fighting, there would be text messages.  He would delete messages when he was angry at his mother.  He also said Kim hated him going out and drinking.  He said there was a "good possibility" that, when he was drunk, he had deleted messages on his phone that night.

Connell remembered talking with his aunt in Scotland around 1:00 a.m. on his cellphone about his parents being dead and then getting in the car.  He claimed he intended to call the police as suggested by his aunt, but as he opened the garage door and drove onto the driveway, the police were already there.  He told Detective Sporer he did not remember having driven anywhere else after he had found his parents' bodies.  Later in the same interview, however, he told the detective he had gotten into the car after finding the bodies and driven around for 15 or 20 minutes before returning to the house.

Before Connell called his aunt, he had tried to clean up and had poured bleach on Christopher's body.  He touched his parents' bodies but did not move them.  When Detective Sporer asked about Connell's prior interview account of having heard a gurgling noise, Connell said he "honestly" had not heard any sound from Christopher.  He had changed out of his blue shirt and threw it on his bed because he had laid next to Christopher in the pool of blood. He also laid next to his mother.  After he found their bodies, he did not drink any alcohol.

Christopher kept cash in the small safe, and Connell had seen $10,000 to $15,000 in cash in that safe three or four weeks

earlier.  Connell had been laid off from work when he was serving a nine-month jail term in Colorado for a DUI.  He had trouble finding work after he got out of jail in December.  Connell acknowledged he never had a bank account, and he had always owed Kim and Christopher "quite a bit of money."  The last time he had any kind of substantial cash flow was more than a year earlier.  All of his money from his employer, such as his final employment payment, was put into Kim and Christopher's account because he "get[s] kind of in a mess" when he handles his finances.  The credit card he was carrying on Friday was linked to a joint credit account that was in all three names but essentially owned by Kim and Christopher.  They were just letting him use it.

At the Fresno sports bar and at least one of the two bars he had visited that Friday night, he had paid in cash from $200 that Kim had withdrawn from an ATM the day before the incident and given to him.  He claimed the last time he had taken any cash from the book in the entryway armoire had been to take a $20 bill several days earlier so he could run to the store to buy groceries for dinner.  Although it was usually Christopher or Kim who replenished the cash in the book, Connell stated he did not need to ask permission to take cash from it.  He claimed he did not access that cash after he had spent time with Kim's and Christopher's bodies.  He said there was no reason for blood to have been on the book or on the cash inside the book, nor for cash to be have been found in the toilet ready to be flushed.  He did not recall putting any cash in the toilet.

Detective Sporer asked Connell if he would like to write an apology letter to his family, and Connell agreed to do so.  At the conclusion of the interview, the detective asked Connell if he had

17

any mental health issues, and Connell replied, "No." Connell stated, "I know I did it. I just don't know what led to it."

e. *Connell's trial testimony*

At trial Connell admitted he had killed Christopher, the only father figure he had ever known, but claimed he did not kill Kim. He testified he had killed Christopher for shooting his mother. He said, although he had not seen Christopher kill Kim, he had heard Christopher do it.

Connell testified Christopher had sexually molested him from when he was 10 to 14 years of age. He described the years of molestation in graphic detail and added, although Christopher never intentionally showed him pornography, he had found Christopher's adult pornography "laying out" in the house when he was 13 or 14 years old, as well as Christopher's videotapes of child pornography. After Christopher had raped him, he had difficulty socializing and had no friends. He had not told anyone about the abuse, including Sonia, whom he greatly respected and with whom he was close, until he spoke with Kim on the night of the shootings.

On that night Connell told Kim he was going to take a job in Papua New Guinea and live in Scotland and he was uncertain if he would ever return. She asked him why he was being so selfish. He replied he could no longer live at home; and, after further prodding, he told her about the molestation. Kim slapped Connell and stormed into the house from the garage, where they had been talking. She took the .38 Special from the master bedroom; held the gun to Christopher's face; said she wanted a divorce; and put the gun down on the master bedroom dresser. After arguing with Christopher, Kim was on her way out of the house with Connell when Kim said she needed to get something

18

and went back up the hallway.  Connell heard Kim call for his help and her body crash to the ground.

Connell hid in a closet; and, as Christopher walked past it, Connell jumped out.  While Christopher tried but failed to land any strikes against Connell, Connell overpowered Christopher, including by "sweep-kick[ing]" Christopher to the ground, sweeping the gun from Christopher's left hand, picking Christopher up by the shirt, throwing Christopher around and mounting Christopher until Connell thought Christopher would no longer move.  Connell did not fear for his own safety because he "knew [he] was going to kick [Christopher's] ass."

After Connell went to check on Kim, he ran over to Christopher just as Christopher was picking the gun back up.  Connell kicked Christopher and threw him around until Christopher ended up on the ground in front of the kitchen.  Connell punched Christopher a few times and told him he was going to die painfully for what he did to Kim.  After Connell secured the gun and went to lie next to Kim, Christopher got up and said at least Connell had given him better blow jobs than Kim had.  Connell shot him three times.  He had shot Christopher with the intent to, and did, kill Christopher and had felt no remorse.

Connell chose not to call the 911 emergency number and had never intended to call the police; rather, he was going to cut up Christopher's body and drive it to Christopher's father's house.  Although he admitted he had cleaned up the crime scene with cleaning agents, he said it was because he wanted to "do something bad to Chris."  Shooting his stepfather had not been sufficient retribution, considering "everything he had done to me."  He also claimed he had not intended to pour chemicals all

over the floor.  He testified he had only wanted to pour gasoline on Christopher's body to hurt it, but because there was not enough gasoline left in the gas tank, Connell poured bleach on Christopher's body, some of which "might have just . . . splashed" onto the floor.  Upon further questioning on cross-examination, however, Connell acknowledged there was bleach all over the entryway, under the sofa and into the family room area.  As for the gun, he said he thought he had left it on the kitchen counter but he may have put it back in the nightstand.

Connell testified he had chosen to lie repeatedly to the detectives during the two prior interviews notwithstanding having sworn he was telling them the truth and had specifically stated several times to them he was being honest when he was not.  He affirmed that, after having told a number of significant lies in both interviews, he "had four years to think about it" and at trial he was telling "version number three."  He had sworn at trial to tell the truth but admitted he does not always tell the truth when he swears to do so.  His story in the first interview included some truths but mostly lies.  He admitted he had a good imagination and fabricated details to make his story seem more credible.  As for the second interview, he had started out wanting to tell the truth but had ended up lying again.  Among Connell's many lies during his interviews were that Christopher was into horse racing and boxing, had a loan shark and gambling debts, and would bet $30,000 on a horse through a bookie named Nacho.  Nacho was Connell's bookie, not Christopher's.  It was easy to make up lies about Christopher because Connell just falsely attributed to Christopher things he himself did.  He claimed he had lied to the police about having a great relationship with Christopher; he hated his stepfather.

Connell said he was embarrassed by his sexual abuse history and did not want others to know. He believed he could not just tell the police Christopher had killed Kim and he had killed Christopher without mentioning that history; it would not have been "the whole story."

### f. *The testimonies of Sonia, the Higginbothams' neighbor and Christopher's coworkers and supervisor*

In addition to describing the night of the shooting from her perspective, including her 911 call, Sonia testified she had spent time with the Higginbotham family since at least when Connell was four through his adulthood. Sonia and Connell had a good relationship and confided in each other, and she had never noticed Connell act differently around Christopher from the ages of 10 to 14. Christopher was a loving, compassionate father.

Sonia had, however, seen Connell get into an argument with Kim because of his drinking, and Kim would become very upset. Sonia had also seen Connell drink alcohol several times and become angry, belligerent and out of control. The last time that she had visited the family, Connell had been in some trouble; and Christopher, when Connell was not in the room, had expressed his concerns about how much money was being spent on lawyers and bail. She often heard Connell calling his parents his "cash cows," as if his parents existed to provide for him financially. On the night that Connell had shown her Christopher's and Kim's bodies on his phone, he had been rubbing his head furiously when she had asked him, "Did you do this?" Connell had a tendency to lie and to rub his head when lying; "[i]t was almost like a tick that he has."

The Higginbothams' neighbor Douglas Forst, who had lived across the street for 18 or 19 years, testified he knew the family well and his two sons played with Connell when the children were growing up. Christopher and Kim were "perfect for each other," and Christopher enjoyed fatherhood. Forst never saw Christopher lose his temper or raise his voice or act violently toward Connell.

According to the testimonies of Christopher's coworkers, Christopher was "genuinely happy" when he talked about Kim, although he did express concerns about Connell's drug and alcohol problems. Christopher was not a violent person; to the contrary, Christopher was described as patient, "easy-go-lucky," and "very levelheaded." Christopher's supervisor testified "it was very obvious" Christopher was in love with Kim, and he "absolutely" believed Christopher would do anything to help Connell.

3. *The Verdict*

On February 13, 2020 the jury returned signed verdicts finding (1) Connell guilty of the first degree murder of Christopher as charged in count 1; (2) true that Connell personally and intentionally discharged a firearm causing great bodily injury or death to another during the commission of the crime charged in the first count; (3) Connell not guilty of the first degree murder of Kim as charged in count 2; (4) Connell guilty of the second degree murder of Kim as a lesser included offense in the crime charged in count 2; and (5) true that Connell personally and intentionally discharged a firearm causing great bodily injury or death to another during the commission of the crime charged in the second count. The jury also found true the

multiple-murder special circumstance as alleged in the second count for Kim's murder.

# DISCUSSION

1. *Substantial Evidence Supported Connell's Conviction for the Second Degree Murder of Kim and the Multiple-murder Special Circumstance*

   a. *Standard of review*

"'When reviewing a challenge to the sufficiency of the evidence, "'we ask whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for "'substantial evidence—that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Flores* (2020) 9 Cal.5th 371, 411.) We do not "reconsider the weight to be given any particular item of evidence" and "ask not whether the jury's judgment was the most probable interpretation of the evidence, but simply whether it was a rational one." (*Navarro,* at pp. 302, 307.)

b. *The identification of Connell as Kim's killer was supported by more than consciousness-of-guilt evidence*

Connell contends there was insufficient evidence identifying him as the perpetrator of his mother's murder and that his conviction as to count 2, as well as the multiple-murder special-circumstance finding, should thus be reversed. Specifically, he argues his tampering with the crime scene, appearing about to flee and lying to the detectives during his interviews—all of which indicate Connell's consciousness of guilt—were insufficient to support his identity as Kim's killer because evidence of consciousness of guilt is by itself insufficient to prove guilt, as the jury was told in the pattern jury instructions. (See *People v. Najera* (2008) 43 Cal.4th 1132, 1139 ["the instructions concerning consciousness of guilt (CALJIC Nos. 2.03, 2.04, 2.05, and 2.06) recite that such evidence is not sufficient by itself to prove guilt"]; see also § 1127c [evidence of flight is not sufficient in itself to establish guilt].) He further asserts, although he had admitted killing his parents, he had done so in the context of having no memory of the murders and the consciousness-of-guilt evidence, coupled with his "speculative" admission made with lack of personal knowledge, were thus insufficient to constitute substantial evidence to support his identity as the count 2 killer.

As the Supreme Court has made clear, evidence probative of a defendant's consciousness of guilt may, in turn, be probative of his or her identity as the perpetrator of the charged offenses. (*People v. Harrison* (2005) 35 Cal.4th 208, 230; see *People v. Armstrong* (2016) 1 Cal.5th 432, 457 [defendant's consciousness of guilt with regard to shooting was "probative of his identity as the perpetrator of that murder"].) In addition, consciousness-of-

guilt evidence was far from the only evidence supporting the identification of Connell as the individual who shot Kim and his guilt of matricide. Not only did he attempt to destroy the evidence at the crime scene as it related to both victims and then to flee after his aunt said she intended to notify law enforcement, but in his second interview with Detective Sporer Connell also admitted he had killed Kim. That admission was not simply a false statement evidencing consciousness of guilt (as were, for example, his lies to the detective about the phone call from his friend Teeague and Christopher's purported gambling habit); it was a confession. The jury was entitled to believe that version of Kim's murder was true, not the child-abuse-related story Connell told at trial, while disbelieving Connell's assertion during the interview that he was in a blackout when he killed both parents. Nothing more is required to support his identity as Kim's murderer. (See *People v. Maxwell* (1979) 94 Cal.App.3d 562, 577 ["[A]bsent exceptional circumstances demonstrating the witness's testimony is inherently improbable, the fact that a witness's testimony is false in part does not preclude a trier of fact from accepting as true the rest of it. If it can be accepted as true, testimony which establishes all the elements of a crime must necessarily constitute substantial evidence of 'solid value' that such crime was committed. Moreover, the testimony of a single witness is sufficient"]; CALCRIM No. 226 [given at trial without objection, providing, in part, "You may believe all, part, or none of any witness's testimony. . . . [¶] . . . [¶] . . . [I]f you think the witness lied about some things, but told the truth about others, you may simply accept the part you think is true and ignore the rest"]; cf. *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 912, fn. 13 [although corpus delicti rule required evidence of "'the fact

25

of injury, loss, or harm, and the existence of a criminal agency as its cause'" that was independent of the extrajudicial statements, confessions, or admissions of the defendant, "'[i]t is not necessary for the independent evidence to establish that the defendant was the perpetrator'"].)

Additional evidence also supported the jury's verdict. Connell, who does not challenge his conviction for Christopher's murder, admitted intentionally killing Christopher with the .38 Special. The evidence showed that same gun was used to kill Kim. In addition, Connell's claim of physically overpowering Christopher before killing him to avenge Christopher's shooting of Kim was inconsistent with Connell's earlier testimony about his own medical difficulties, which included his body breaking down, a bad back and three knee surgeries, as well as the forensic pathologist's findings that Christopher's chest, shoulder, neck and throat did not reflect antemortem injuries indicative of a violent altercation.

Connell argues there was no evidence of any motive for him to kill his mother. But, as the jury was instructed—an instruction he has not otherwise directly challenged—the "People are not required to prove that the defendant had a motive to commit any of the crimes charged." (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 741 ["evidence of motive is not required to establish intent to kill"].) Moreover, there was evidence from which the jury could have concluded, if it was concerned about motive, that Connell believed killing Kim, as well as Christopher, was necessary for Connell to continue to have access to their money to fund his use (abuse) of alcohol and other substances. Connell was unemployed and his finances were a mess. He did not have his own bank account and often called his parents his

"cash cows." He owed them "quite a bit of money" and had to seek their permission to spend the household cash. Yet, while Connell was dependent on his parents' cash, Kim hated him going out and drinking. He had fought with Kim in the past about his drinking. The last time Sonia had visited, Christopher had been concerned about having to spend money to constantly bail Connell out of legal trouble. And, when admitting he believed he had killed his parents, he told the detective he believed "it was something that had to do with [his] drinking." The jury could also have reasonably disbelieved Connell's claim he had not taken any of the household cash on the day his parents had been shot, which contradicted his earlier statement to the detectives he had returned the cash he had taken from the household stash—a statement from which, along with evidence of cash in the toilet ready to be flushed, the jury could reasonably infer he had tried to destroy evidence of his motive for the shooting.

2. *There Is No Merit to Connell's Contention His Conviction on Count 2, as well as the Multiple-murder Special-circumstance Finding, Should Be Reversed Because of Prosecutorial Misconduct*

a. *Governing law and standard of review*

"""[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements."""" (*People v. Bell* (2019) 7 Cal.5th 70, 111.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the

complained-of comments in an improper or erroneous manner.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Ibid.*)

""'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 333-334.) Bad faith on the prosecutor's part is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 821; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 61.) In this regard, "'[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno*, *supra*, 60 Cal.4th at pp. 666-667; see *People v. Sandoval* (2015) 62 Cal.4th 394, 438.) "[T]he burden of proof is on the defendant to show the existence of misconduct." (*People v. Van Houten* (1980) 113 Cal.App.3d 280, 292.)

Ordinarily, ""'[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.'"" (*People v. Charles* (2015) 61 Cal.4th 308, 327; see *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657 [""'As a general rule a defendant may not complain on

appeal of prosecutorial misconduct unless in a timely fashion—
and on the same ground—the defendant made an assignment of
misconduct and requested that the jury be admonished to
disregard the impropriety""'"].)  The forfeiture doctrine does not
apply when a request for an admonition would have been futile or
would not have cured the harm.  (*People v. Seumanu, supra,*
61 Cal.4th at pp. 1328-1329; *People v. Hill, supra,* 17 Cal.4th at
p. 820.)

When the issue has been preserved, we review a trial
court's ruling regarding prosecutorial misconduct for abuse of
discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  A
defendant's conviction will not be reversed for prosecutorial
misconduct that violates state law "'unless it is reasonably
probable that a result more favorable to the defendant would
have been reached without the misconduct.'"  (*People v. Wallace*
(2008) 44 Cal.4th 1032, 1070-1071; accord, *People v. Rivera,*
*supra,* 7 Cal.5th at p. 334.)  "Federal constitutional errors subject
to harmless error review," in contrast, "are reviewed under
*Chapman* [*v. California* (1967) 386 U.S. 18]," which requires a
reviewing court "to reverse the conviction unless the People can
demonstrate that the error was harmless beyond a reasonable
doubt."  (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

   b.   *Any alleged prosecutorial misconduct in closing*
        *argument was harmless*

In his closing argument the prosecutor, stating he had to
prove the murder charges beyond a reasonable doubt, told the
jury, "What the defendant's stories have done, version 1, 2 and 3,
is create an imaginary doubt at best.  In order to vote not guilty
in this case, you have to believe the defendant is an honest
person, who is a credible witness in this case and hadn't been

29

lying about significant facts in this case." Defense counsel objected on the ground the prosecutor's remarks misstated the law. The trial court requested the prosecutor rephrase, so the prosecutor told the jury, "In order to find the defendant not guilty, you've got to believe his story." Defense counsel again objected, stating, "That misstates the law. It shifts the burden." The trial court overruled defense counsel's second objection. Defense counsel began his closing argument by stating to the jury, "It is absolutely untrue that Derek Connell has to prove himself innocent."

On appeal Connell contends his conviction on count 2, and thus the multiple-murder special-circumstance finding, should be reversed because the prosecutor's remark that the jury had to believe Connell's story to find him not guilty misstated the law by improperly shifting the burden of proof. Specifically, Connell argues the prosecutor's statement erroneously suggested that, if the jury did not believe Connell's testimony, the People no longer had the burden of proving every element of the charged crimes and that Connell had to present affirmative evidence of his innocence.

Although defense counsel had failed to request an admonition, Connell has not forfeited his claim of prosecutorial misconduct, as argued by the People, because the trial court had overruled his objection to the prosecutor's statement that he now challenges. A request for admonition would thus have been futile. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 411, 476 ["[t]he court overruled some, although not all, of the objections, thus making a further request for an admonition futile as to those objections"].)

30

Any misconduct by the prosecutor, however, was harmless because it was not reasonably probable the jury would have reached a result more favorable to Connell absent the misconduct. The court had provided the jury with the following instructions that correctly explained the People's burden of proof: (1) "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt"; (2) "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty"; (3) "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt"; (4) "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt"; and (5) "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent and mental state." The court also provided the jury with the following special jury instructions: (1) "It is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove himself innocent"; and (2) "[n]either false statements of the defendant, nor suspicious circumstances, are sufficient to support a verdict of guilty in a criminal case." The court further instructed the jury, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions,

you must follow my instructions." (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1162, 1166-1168 [where defendant alleged the prosecutor's statements to the jury violated his constitutional rights by diluting the reasonable doubt standard and shifting the burden of proof to him and the Supreme Court determined the prosecutor committed misconduct in part by remarks "preclud[ing] jurors from having reasonable doubt solely based on the insufficiency of the prosecution's evidence," reversal was nevertheless unwarranted because the court had provided correct jury instructions and thus there was "no reasonable probability" the misstatements caused any juror to convict based on a lesser standard than proof beyond a reasonable doubt].)

Moreover, although Connell argues it was reasonably probable the jury would have found the evidence insufficient to identify him, as opposed to Christopher, as Kim's killer in the absence of the prosecutor's misstatement, the jury's separate finding against Connell on the additional firearm enhancement for count 2—after it had been instructed the People had the burden of proving beyond a reasonable doubt each allegation of that enhancement, including that "[t]he defendant personally discharged a firearm during the commission of that crime" and "[t]he defendant's act caused the death of a person"—supports our conclusion the jury properly found beyond a reasonable doubt it was Connell who shot the firearm that killed Kim. (Cf. *People v. Scully* (2021) 11 Cal.5th 542, 598 [instructional error relating to the charged crimes was harmless beyond a reasonable doubt in light of the jury's true findings on the special circumstances allegations].)

32

3. *The Matter Must Be Remanded for Resentencing To Correct the Unauthorized Sentences*

a. *Procedural background*

The trial court instructed the jury with CALCRIM No. 700, the special circumstance introduction, which provides in part, "If you find the defendant guilty of first degree murder, you must also decide whether the People have proved that the special circumstance is true. [¶] The People have the burden of proving the special circumstance beyond a reasonable doubt."[9] The court also instructed with CALCRIM No. 721, which provides, "The defendant is charged with the special circumstance of having been convicted of more than one murder in this case. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant has been convicted of at least one charge of first degree murder in this case; [¶] AND [¶] 2. The defendant has also been convicted of at least one additional charge of either first or second degree murder in this case."

The jury was provided a packet of blank verdict forms, which included an identical multiple-murder special-circumstance verdict form on page 8 (after the page 7 verdict form for first degree murder on count 2) and on page 11 (after the page 10 verdict form for second degree murder on count 2). The jury during its deliberations submitted a note to the court that

_____

[9] The trial court's oral instructions contained immaterial variations from the written instructions that had been provided. We set forth the written instructions as controlling. (*People v. Edwards* (2013) 57 Cal.4th 658, 746 ["'[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control'"].)

33

stated, "Verdict paperwork page 8 & 11 appear to be the same page and need clarification on what form to complete." The court responded, without objection by defense counsel, by referring the jury to CALCRIM No. 721. The jury subsequently returned its verdict and included verdict forms that were signed on pages 8 and 11 finding true the multiple-murder special circumstance.

After excusing the jurors, the trial court stated on the record that the parties' counsel and the court, after discussion, had decided, in preparing the verdict form, to insert the multiple-murder special circumstance "in count 2" (first degree and second degree murder of Kim) and "not put it in count 1" because "[w]e thought that would make it easier for the jury." The court explained, as set forth in the verdict form, the jury found true that the defendant in the proceeding had been convicted of more than one offense of murder in the first or second degree. The court continued, "So technically they were correct in filling it out for first degree murder in count 2, even though they found him not guilty, because on the next page they did find him guilty of second degree murder. They then followed up with that with a finding under [section] 190.2 for second degree murder, which makes it a valid finding because of the first degree murder in count 1. Therefore, we do have a first degree murder finding in count 1, a second degree murder finding in count 2, and the [section] 190.2, sub (a), sub (3) finding to be true as to count 2. Therefore, it is a lawful and valid verdict." The court stated, "I did bring this up to counsel at sidebar, and I believe both counsel were willing to, in light of that discussion, waive any procedural error on that." The prosecutor and defense counsel both expressed their agreement with the court's statements.

34

On March 12, 2020 the court, after hearing the arguments of counsel, sentenced Connell to a term of life without the possibility of parole for second degree murder (count 2) pursuant to section 190.2, subdivision (a)(3), given the multiple-murder special circumstance, plus 25 years to life for the count 2, section 12022.53, subdivision (d), firearm-use enhancement. The court also sentenced him to a term of 25 years to life for first degree murder (count 1), plus 25 years to life for the count 1, section 12022.53, subdivision (d), firearm-use enhancement. The court ordered the sentences to be served consecutively, with a total sentence of "life without the possibility of parole, plus 25 years to life, plus 25 years to life, plus 25 years to life."

The court explained it had read and considered the probation officer's report. That report had recommended the sentences ultimately imposed by the court. The court stated there were no circumstances in mitigation. Circumstances in aggravation, the court continued, were that Connell had taken advantage of a position of trust, as the victims were his parents; his prior convictions as an adult were numerous and of increasing seriousness; his prior performance on adult probation was unsatisfactory; and his actions displayed a high level of sophistication and planning. The court set forth reasons Connell was statutorily ineligible for felony probation; stated, "The defendant . . . is absolutely an unsuitable candidate for a grant of felony probation"; listed circumstances of the case that it had found concerning; and said, "The defendant has shown through . . . callous and violent actions in the instant offense that he is a great danger to the community." The court also explained its reasons for ordering Connell to serve consecutive sentences

notwithstanding defense counsel's request for concurrent sentences.

> b. *The trial court's sentences on counts 1 and 2 were unauthorized*

> i. The sentence for count 2 must be vacated

Section 190, subdivision (a), provides in part, with exceptions not applicable here, "[E]very person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 15 years to life." Connell contends, the People concede, and we agree the trial court imposed an unauthorized sentence of life without the possibility of parole for Connell's conviction on count 2 for the second degree murder of Kim. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1047-1048 [sentence of life imprisonment without possibility of parole on the second degree murder count was error].) Although Connell did not object in the trial court to the imposition of a greater term of imprisonment for the second degree murder count than authorized by statute, an "unauthorized" sentence—which is a sentence that "could not lawfully be imposed under any circumstances in the particular case" (*People v. Scott* (1994) 9 Cal.4th 331, 354; accord, *People v. Rivera*, *supra*, 7 Cal.5th at p. 348)—is "reviewable 'regardless of whether an objection or argument was raised in the trial and/or reviewing court.'" (*People v. Smith* (2001) 24 Cal.4th 849, 852; see *Barnwell*, at pp. 1047-1048 & fn. 7 [in determining an erroneous second degree murder sentence of life imprisonment without the possibility of parole should "reflect the fact that the correct sentence for that count is a state prison term of 15 years to life," the Supreme Court in a footnote explained a "claim that a sentence is unauthorized may be raised for the first time on appeal"].)

The trial court's apparent belief it could impose a life-without-parole sentence for second degree murder pursuant to section 190.2, subdivision (a)(3), because the jury found true the multiple-murder special-circumstance allegation was mistaken. A special circumstance finding elevates the punishment only for a conviction of first degree murder.  (§ 190.2, subd. (a) ["[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . true"].)  Accordingly, we vacate the sentence imposed on count 2 for the murder of Kim and remand for the trial court to impose a legally correct sentence.

ii.    The sentence for count 1 must also be vacated

Although the trial court, with the consent of counsel, arranged the verdict form in a manner that seemed to connect the jury's finding on the multiple-murder special-circumstance allegation to the count charging Connell with Kim's murder—the second charged murder—a section 190.2, subdivision (a)(3), allegation is separate from the individual murder counts and is properly based, in the words of the statute, on whether "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree."  (See, e.g., *People v. Anderson* (1987) 43 Cal.3d 1104, 1150 ["no matter how many murder charges are tried together, they constitute a single multiple-murder special circumstance"]; see also *People v. Bonin* (1988) 46 Cal.3d 659, 691 ["""appropriate charging papers should allege one multiple-murder special circumstance separate from the individual murder counts"""]; *People v. Carbajal* (2013) 56 Cal.4th 521, 541 (conc. opn. of Kennard, J.) ["[t]he multiple-

victim allegation at issue here also is like our death penalty law's multiple murder allegation in that neither is attached to any particular charged crime"].)

The jury, correctly instructed on the elements of the multiple-murder special circumstance, found it true. Given that finding, because Connell was guilty of the first degree murder of Christopher, the trial court was obligated to sentence him on count 1 to life without the possibility of parole as mandated by section 190.2, subdivision (a).)[10] (See § 1385.1 ["[n]otwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is . . . found by a jury or court as provided in Sections 190.1 to 190.5, inclusive"]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1075-1076 ["once the jury found the lying-in-wait special circumstance to be true, the trial court could not strike or dismiss it pursuant to section 1385"].) The People contend, and we agree, the trial court's sentence on count 1 of an indeterminate state prison term of 25 years to life (plus the firearm-use enhancement), rather than life without parole, was unauthorized notwithstanding section 190, subdivision (a),[11] and must be

[10] Section 190.2, subdivision (a), provides the penalty for first degree murder with a special-circumstance finding must be either death or imprisonment for life without the possibility of parole. The People do not seek the death penalty in this case.

[11] Although section 190, subdivision (a), provides in part, "Every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life," it further states that "[t]he penalty to be applied shall be determined as provided" in certain enumerated statutory sections, including section 190.2.

corrected.  (See *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164 ["The finding of a special circumstance thus eliminates the possibility of a 25-year-to-life sentence and leaves only the sentencing options of death or [life without parole]"].)

Connell, conceding section 1385.1 precludes the trial court from striking or dismissing any section 190.2 special-circumstance finding by the jury, asserts the trial court nevertheless had the authority to impose a lesser punishment than provided by statute to prevent the imposition of an unconstitutional punishment.  (See *People v. Mora* (1995) 39 Cal.App.4th 607, 615 ["[i]f the punishment mandated by law for a special circumstances murder is so grossly disproportionate to a particular defendant's individual culpability as to constitute cruel or unusual punishment . . ., a court has authority to prevent the imposition of unconstitutional punishment"].)  Based on this authority, Connell contends we should presume the trial court properly considered mitigating circumstances and imposed the term of 25 years to life on count 1 because a sentence of life without parole would violate the constitutional prohibition against cruel and unusual punishment.  He speculates the court may have been particularly influenced by his testimony he had been sexually abused by Christopher when a child.

Connell's argument, albeit creative, ignores what actually occurred at sentencing.  Far from finding a sentence of life without parole would constitute cruel or unusual punishment for these double murders, the trial court not only imposed that exact sentence (although on count 2, rather than count 1) but also added three consecutive 25-year-to-life terms to it, plainly indicating it did not want Connell ever to go free.  Moreover, contrary to Connell's conjecture about unspoken mitigating

factors, the record affirmatively reflects the trial court found there were no mitigating circumstances while finding multiple circumstances in aggravation, including that Connell had taken advantage of his position of trust, as the victims were his parents.

Asserting that his cruel-and-unusual-punishment argument means the 25-year-to-life sentence on count 1 was "authorized," notwithstanding its clear violation of the mandate of section 190.2, subdivision (a), Connell contends the sentence on count 1 cannot be changed to life without parole as part of the correction to the court's sentencing error on count 2. Because, for the reasons discussed, the count 1 sentence is unauthorized and must be corrected, this argument, aside from any other analytic shortcomings, necessarily fails. (See *People v. Hanson* (2000) 23 Cal.4th 355, 360, fn. 3 ["'when a trial court pronounces an unauthorized sentence[,] [s]uch a sentence is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement'"]; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 431-432 [same]; see also *People v. Neely* (2009) 176 Cal.App.4th 787, 799-800 ["Neely contends that a defendant may not be subject to an aggregate sentence that is greater than initially imposed when a case is remanded for resentencing. [Citations.] But the sentence imposed by the trial court is a legally unauthorized sentence. [Citation.] A more severe sentence may be imposed following a successful appeal if the initial sentence was unlawful or unauthorized"]; *People v. Craig* (1998) 66 Cal.App.4th 1444, 1449.)[12]

---

[12] Connell's reliance on *People v. Burbine* (2003) 106 Cal.App.4th 1250 is misplaced. *Burbine* reiterated what it

In sum, the sentence on count 1, like the sentence on count 2, is unauthorized. We vacate the sentence on both counts and remand the cause to the trial court to resentence Connell in accordance with all governing law, including any recently enacted ameliorative legislation that may be applicable.

## DISPOSITION

The convictions on both counts and the true findings on the enhancements and special circumstance are affirmed. The sentence on both convictions is vacated, and the matter is remanded to the trial court for resentencing in a manner not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.                                    FEUER, J.

---

referred to as the settled principle that a felony defendant's original aggregate prison term cannot be increased on remand for resentencing following an appeal that reversed one of several counts of a felony conviction (*id.* at p. 1253) and then held, following reversal of a felony count for which a subordinate term had been imposed, the trial court is not barred "from reconsidering its prior sentencing choices made under the normal rules of felony sentencing, including imposing a higher term for the principal, or base, term, so long as the total prison term for all affirmed counts does not exceed the original aggregate sentence." (*Ibid.*) *Burbine* did not involve the situation presented by Connell's case in which all counts are affirmed on appeal and the cause is remanded for resentencing to correct unauthorized sentences.